IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LAWRENCE LEE BUTTON,           :
                               :
              Plaintiff        :    CIVIL No. 3:12-CV-00866
                               :
         vs.                   :    Hon. John E. Jones III
                               :
CAROLYN W. COLVIN, ACTING      :
COMMISSIONER OF SOCIAL         :
SECURITY,                      :
                               :
              Defendant        :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Lawrence Lee Button's claim for social security supplemental security income benefits. Button contends that he suffers from both physical and mental disabling impairments. The physical conditions alleged are asthma and "back impairments" and the mental conditions are bipolar disorder and a learning disorder. Doc. 10, Plaintiff's Brief, p. 6.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Button protectively filed[1] his application for supplemental security income benefits on March 29, 2006. Tr. 18, 68 and 107-109.[2] The application was initially denied by the Bureau of Disability Determination[3] on August 4, 2006. Tr. 18 and 70-74. On September 25, 2006, Button requested a hearing before an administrative law judge. Tr. 18 and 78. After over 26 months had elapsed, a hearing was held before an administrative law judge on December 3, 2008. Tr. 27-66. Button was represented by counsel at the hearing. Id. On February 26, 2009, the administrative law judge issued a decision denying Button's application. Tr. 18-26. As will be explained in more detail *infra* the administrative law judge, after considering the medical records and the testimony of Button and a vocational expert, found that Button could perform a limited range of unskilled, medium work,[4] specifically the jobs of

---

[1]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2]References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on July 11, 2012.

[3]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration. Tr. 70.

[4]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

packing machine operator and hand packer. Tr. 22, 26 and 58-59.

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*. Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 416.967.

On April 27, 2009, Button filed a request for review with the Appeals Council of the Social Security Administration's Office of Disability Adjudication and Review, and on November 6, 2009, the Appeals Council concluded that there was no basis upon which to grant Button's request for review. Tr. 10-13. On November 19, 2009, Button requested that the Appeals Council reopen the case to allow him to submit additional information in support of his request for review. Tr. 9. On March 11, 2010, the Appeals Council granted Button's request to reopen and gave him 25 days to submit any additional arguments and information he deemed appropriate. Tr. 7.

On March 23, 2010, Button submitted to the Appeals Council a letter brief outlining his contentions. Tr. 168-171. One of the contentions raised by Button was that the administrative law judge failed to consider or ignored a statement (which primarily was a checkbox assessment form) of Button's mental work-related functional abilities (Administrative Hearing Exhibit 10F) completed on behalf of Button by Sampath Neerukonda, M.D., a treating psychiatrist. Tr. 169. After considering Button's arguments, the Appeals Council on March 6, 2012, again concluded that there was no basis upon which to grant Button's request for review. Tr. 1-5. The Appeals Council in its notice of denial of Button's request for review "gave particular attention to" the argument that Dr. Neerukonda's assessment was overlooked or ignored. Tr. 1. The

Appeals Council indicated that Dr. Neerukonda's assessment was inconsistent with Dr. Neerukonda's treatment notes and specifically stated that the "treatment notes do not suggest that [Button was] disabled and [that its] comparison of Dr. Nee[r]ukonda's assessment on the checkbox assessment form do[es] not suggest that [Button] lacked the capacity for the specific jobs that the vocational expert identified as appropriate." Tr. 2. As a result of the Appeals Council's denial of review, the administrative law judge's decision stood as the final decision of the Commissioner.

Button then filed a complaint in this court on May 9, 2012. Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on October 8, 2012, when Button elected not to file a reply brief.

Button was born in the United States on October 11, 1976, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c). Tr. 34, 62, 130 and 137.

Button stated in documents filed with the Social Security

---

[5]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

[6]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Administration that he attended the Wellsville High School, Wellsville, New York, from September, 1991 to June, 1992; he obtained a General Equivalency Diploma (GED) in 1994; and he can read, write, speak and understand the English language. Tr. 120 and 125-126. Button testified at the administrative hearing that he withdrew from high school while attending the 11th grade. Tr. 53. He further indicated that he had difficulty with math and that he was in special education classes as a result of that deficiency. Tr. 52-53, 125 and 249. Button reported that after obtaining a GED, he did not complete "any type of special job training, trade or vocational school."[7] Tr. 126.

Button has a very limited work and earnings history. Tr. Button testified that he had 30 to 35 jobs but all of relatively short duration. Tr. 53-54. He stated that the longest job lasted for 4 to 5 months. Tr. 55. The records of the Social Security Administration reveal that Button had earnings in the years 1997 through 2003.[8] Tr. 112. Button's annual earnings range from a low of $298.65 in 1999 to a high of $11,783.50 in 2002. Id. Button's total earnings during those 7 years were $20,620.09. Id.

---

[7]Button told Dr. Neerukonda at their first encounter on March 13, 2006, that he was "self-employed most of the time" but presently unemployed and that "[h]e used to work in computer maintenance and repair." Tr. 174. He also told a physician who examined him on June 29, 2006, that he had "some technical training in computers." Tr. 177.

[8]Button testified that he last worked in 2004 as a janitor through a temporary employment agency. Tr. 33-34.

A vocational expert described Button's work history as follows: (1) a taxicab driver, semi-skilled, medium work;(2) a janitorial worker, semi-skilled, medium work; (3) a telemarketer, semi-skilled, sedentary work; (4) an amusement ride operator, unskilled, light work; (5) a garbage collector, unskilled, very heavy work; (6) a fast food worker, unskilled, light work; (7) an assembly line worker, unskilled, light work; and (8) as a road repair worker, semi-skilled, heavy work. Tr. 56-57 and 122. The administrative law judge found that Button's past relevant work[9] was as a taxicab driver and janitor. Tr. 25.

The record reveals that Button has a history of alcohol

---

[9]Past relevant employment in the present case means work performed by Button during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity. The official website of the Social Security Administration reveals that in 2002 that amount was $780 per month ($9360 per year) and in 2003 the amount was $800 per month ($9600 per year). Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (Last accessed December 16, 2013). The record reveals that Button's earnings only rose to the level of substantial gainful activity in 2002 when he was working as a taxicab driver and earned a total of $11,783.50. Tr. 112 and 114-115. There are discrepancies in the record. It is not clear why the administrative law judge found that Button's past relevant work included the position of janitor. It appears that in addition to working as a taxicab driver (apparently self-employed) in 2002 he also worked as a telemarketer for a cable company in Coudersport, Pennsylvania, and for a temporary employment agency located in Wellsville, New York. Tr. 114-115. His work (apparently as a janitor) and earnings of $3984.88 in 2003 for Gulf Coast Temporaries, Inc., does no amount to substantial gainful activity. Tr. 115 and 122. These discrepancies do not impact our disposition of this case.

and drug abuse[10] as well as criminal convictions. Tr. 51, 221, 244 and 249. Button also reported smoking one pack of cigarettes per day for 20 years.[11] Tr. 228.

Button claims that he became disabled on February 1, 2006.[12] Tr. 32 and 116. In a document filed with the Social Security Administration he stated that he suffers from "bi-polar (sic) disorder, kidney problems, asthma, back problems [and a] learning disability." Tr. 121. Button stated that he "was diagnosed with bi-polar (sic) in [February, 2006]" and that he has "always had problems keeping a job because [he] couldn't handle stress in the workplace." Id. He further contended that he "thinks about things differently than a normal person would because of the bi-polar (sic) disorder," "sometimes" has "pain . . . from the back problems" and "never really understood why [he] was different from other people." Id.

At the administrative hearing, Button was asked why he set

---

[10]Dr. Neerukonda stated in a psychiatric evaluation dated April 27, 2007, that Button "has an extensive history of alcoholism and drug abuse in the past where he was using a lot of heroin, alcohol and marijuana. He says that he is currently sober from heroin seven years ago and marijuana six years ago. He says that he occasionally drinks beer. He also says that he overdosed one time with alcohol and heroin one time." Tr. 249.

[11]On July 19, 2007 a treating physician reported that Button suffered from asthma and tobacco abuse and prescribed the drugs Singulair, Albuterol and Chantix. Tr. 229

[12]Button was only 29 years of age on his alleged disability onset date.

February 1, 2006, as his alleged disability onset date. Tr. 32.
The following exchange took place between Button and the
administrative law judge:

> Q . . . I'm curious as to that date, what kind of problems
> were you experiencing as of February 1st, 2006?
>
> A    I was easily distracted.  When I would have to do
> something.  I had a hard time following through, keeping
> my mind on one thing.  I had times of severe depression,
> where I couldn't even hardly get out of bed because I
> was just so depressed.
>
> Q And had this been a problem for (sic) prior to the date,
> February the 1st, 2006?
>
> A Yes, sir.
>
> Q Okay.  In other words, this problem had existed for
> some time, but you continued to try to work as best you
> could?
>
> A Correct.
>
> Q.  Okay. Can you give me an idea as to any other problems
> besides this depression and difficulty concentrating, that
> you might have been experiencing or that may have
> contributed to these problems in thinking?
>
> A Frustration, I would get frustrated with a vast number
> of things, such as on a job, for instance, my
> telemarketing job, I got to the point where I got so
> frustrated that I was going away from my job station just
> to get away from the pressure.

Tr. 32-34.  Button went on to testify that his last job was in 2004
as a janitor in Florida which he obtained through a temporary
employment agency and that the employment as a janitor lasted for
three months. Tr. 33.   Button further stated that the janitor
position was his last employment. Tr. 34.

Although Button testified that he last worked in 2004, in

a document entitled "Disability Report - Adult - Form SSA-3368"

("Disability Report") Button stated that he stopped working on

December 31, 2003, and that he worked as a janitor in 2003.[13] Tr.

121-122. Earnings records from the Social Security Administration

are consistent with what Button reported in the Disability Report.

Tr. 115. The earnings record indicates that Button last worked for

Gulf Coast Temporaries, Inc., in 2003. Id.

The alleged disability onset date of February 1, 2006, has

no impact on Button's application for supplemental security income

benefits because supplemental security income is a needs based

program and benefits may not be paid for "any period that precedes

the first month following the date on which an application is filed

or, if later, the first month following the date all conditions for

eligibility are met." See C.F.R. § 416.501. As stated above

Button's SSI application was filed on March 29, 2006. Consequently,

Button is not eligible for SSI benefits for any period prior to

April 1, 2006.

During his testimony at the administrative hearing and in

an untitled and undated document filed with the Social Security

Administration, Button indicated that he lives with his girlfriend

and three minor children; Children and Youth Services assists him

with parenting and housekeeping classes in his home; his neighbors

---

[13]Button stated that he "quit the job because [he] thought they
were being unfair to a co-worker" and that he "ended up getting
into an argument over it with a manager." Tr. 121.

assist him with babysitting; and he is able to care for his children, including getting them up in the morning, bathing and feeding them and getting them on the bus for school. Tr. 44-46 and 128. Button further indicated he is able to go grocery shopping although he rests while doing so and he is able to carry about 4 bags of groceries; his hobbies include reading and "playing" with computers; he does housecleaning, including sweeping; he is able to climb 40 steps without resting; he has no problems sitting "unless it's a hard surface;" he can lift and carry "about 40 lbs" but his "back starts to hurt;" he is able to take care of his personal needs, such as dressing himself and taking a shower; he can change and make a bed; he is able to use a regular touch tone telephone, a standard size TV remote control, and a knife and fork; he is able to fasten buttons, snaps, etc., and tie shoes; he is able to go swimming and camping which he engages in a few times during the summer; he is able to make decision on his own; and he stated that he suffers from headaches caused by standing, walking and bright lights but that medicine relieves the pain, Tr. 129-136.

For the reasons set forth below we will affirm the decision of the Commissioner denying Button's application for supplemental security income benefits.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary

11

review of all legal issues decided by the Commissioner. See Poulos
v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007);
Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431
(3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir.
1995). However, our review of the Commissioner's findings of fact
pursuant to 42 U.S.C. § 405(g) is to determine whether those
findings are supported by "substantial evidence." Id.; Brown v.
Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994
F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are
supported by substantial evidence must be upheld. 42 U.S.C.
§405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir.
2001)("Where the ALJ's findings of fact are supported by
substantial evidence, we are bound by those findings, even if we
would have decided the factual inquiry differently."); Cotter v.
Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the
Secretary must be accepted as conclusive by a reviewing court if
supported by substantial evidence."); Keefe v. Shalala, 71 F.3d
1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th
Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11
(11th Cir. 1990).

　　　Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting

Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));
Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d
Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).
Substantial evidence has been described as more than a mere
scintilla of evidence but less than a preponderance. Brown, 845
F.2d at 1213.   In an adequately developed factual record
substantial evidence may be "something less than the weight of the
evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).
Substantial evidence exists only "in relationship to all the other
evidence in the record," Cotter, 642 F.2d at 706, and "must take
into account whatever in the record fairly detracts from its
weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488
(1971). A single piece of evidence is not substantial evidence if
the Commissioner ignores countervailing evidence or fails to
resolve a conflict created by the evidence.  Mason, 994 F.2d at
1064.  The Commissioner must indicate which evidence was accepted,
which evidence was rejected, and the reasons for rejecting certain
evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.
Therefore, a court reviewing the decision of the Commissioner must
scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968,
970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d

Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims. See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[14] (2) has an impairment

_____

[14]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves

14

that is severe or a combination of impairments that is severe,[15] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[16] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity.

---

doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

[15] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).

[16]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

<u>Id</u>.[17]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20 C.F.R. § 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Button's medical records.

On March 13, 2006, a little over a month after Button's alleged disability onset date of February 1, 2006, Button underwent a psychiatric evaluation at Dickinson Mental Health Center, Coudersport, Pennsylvania, performed by Dr. Neerukonda at the request of Button's therapist. Tr. 174-175. The administrative record contains a list of therapy sessions and other appointments

---

[17]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Button had at Dickinson Mental Health from December 5, 2005, through April 17, 2006, but the therapy session notes are not contained within the record. Tr. 176. Button appears to have had an initial assessment by a therapist on December 5, 2005, and sessions were scheduled for December 12 and 19, 2005 and January 6, 18 and 23, and February 15, 2006. Id. Button did not appear for the therapy sessions scheduled for December 12, 2005, and January 6 and 23, 2006. Id. On March 13, 2006, as noted above, Button was evaluated by Dr. Neerukonda, and after that evaluation, therapy sessions were scheduled for March 29, 2007, and April 17, 2006. Id. The record indicates that the therapy session of April 17, 2006 was cancelled because Button apparently was late for it. Id. At the psychiatric evaluation on March 13, 2006, Button told Dr. Neerukonda, inter alia, that he was "depressed, down in the dumps" and tired, irritable, grouchy and having mood swings. Tr. 174. Button indicated that the depression "comes and goes." Id. Dr. Neerukonda noted that Button was never evaluated by a psychiatrist but that he had a history of alcoholism and marijuana use which ended purportedly five years prior to the date of the evaluation. Id. Button told Dr. Neerukonda that "[h]e was self-employed most of the time" but presently unemployed and that he "used to work in computer maintenance and repair." Id. A mental status examination of Button performed by Dr. Neerukonda was essentially normal other than Button exhibited a depressed mood and

17

an anxious affect. Id. Dr. Neerukonda's diagnostic assessment was that Button suffered from depressive disorder, not otherwise specified, and bipolar disorder, depressed, and gave Button a Global Assessment of Functioning (GAF) score of 50-60.[18] Id. Dr. Neerukonda recommended that Button start taking the psychotropic medication Celexa, 20 mg per day.[19] Tr. 175.

---

[18]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. Diagnostic and Statistical Manual of Mental Disorders 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

[19]Celexa "is an antidepressant medication in a group of drugs called selective serotonin reuptake inhibitors (SSRIs)." Celexa, Drugs.com, http://www.drugs.com/celexa.html (Last accessed December 18, 2013).

On the same day that Dr. Neerukonda evaluated Button, Dr. Neerukonda completed a document on behalf of Button entitled "Pennsylvania Department of Public Welfare[,] Employability Assessment Form." Tr. 172-173. In that document, Dr. Neerukonda in a conclusory fashion without specifying any limitations in work-related functional abilities stated that Button was temporarily disabled, less than 12 months. Tr. 173. Dr. Neerukonda stated that Button's temporary disability began on March 13, 2006, and was expected to last until March 13, 2007. Id. Dr. Neerukonda noted that his assessment was based upon Button's clinical history. Id.

Button's had follow-up appointments with Dr. Neerukonda on May 8 and July 24, 2006. Tr. 208-209. At the appointment on May 8th Button told Dr. Neerukonda that he was "doing very well on the current regimen;" he was "tolerating the medicines without any problem;" and "things" were "not bothering him" as they were previously. Id. The results of a mental status examination were essentially normal other than a somewhat depressed mood and an anxious affect. Id. Dr. Neerukonda's diagnostic assessment was that Button suffered from depressive disorder, not otherwise specified. Id. Dr. Neerukonda recommended that Button continue taking Celexa, 20 mg per day, and "provided supportive psychotherapy." Id. At the appointment on July 24th Button reported that "things [were] looking better and brighter." Tr. 208. Dr. Neerukonda noted that Button seemed to be doing very well on

the Celexa. Id. A mental status examination was essentially normal other than Button had a depressed mood and an anxious affect. Id. Dr. Neerukonda's diagnostic assessment was that Button suffered from depressive disorder, not otherwise specified. Id. Dr. Neerukonda recommended that Button continue taking Celexa, 20 mg per day, and "provided supportive psychotherapy." Id.

On June 29, 2006, Button was examined by Dilbach Singh, M.D., on behalf of the Bureau of Disability Determination. Tr. 177-180. At that appointment Button told Dr. Singh that he was there "for the Social Security Physical Exam" and that he "had asthma and some flare-ups on exertion." Tr. 177. Button reported that "he used to use some inhalers" but presently was not taking any medications, including Celexa, because he could not afford them. Id. Button told Dr. Singh that he was not presently working but that he had worked full-time and part-time jobs as a janitor and as a laborer and that he had "seasonal jobs, doing grass cutting and all kinds of things." Id. Button also told Dr. Singh that he finished high school and had "some technical training in computers." Id. Dr. Singh's review of Button's systems[20] was essentially negative with no abnormal items reported. Tr. 178. Button did report "occasionally" having back pain. Id.

---

[20]"The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed December 16, 2013).

The results of a physical examination of Button by Dr. Singh were essentially normal. Tr. 178-179. In fact the musculoskeletal and neurological portion of the exam was noted to be completely normal, including Button had normal motor strength and sensation in his upper and lower extremities; Button was able to sit, stand, walk, lift, grasp and bend normally. Tr. 178. Button told Dr. Singh that he could lift 40 to 50 pounds. Id. Dr. Singh indicated that Button's asthma was under control, his range of motion was good, he had a normal gait, his mental status was normal, and his fund of knowledge appeared to be normal. Tr. 178-179. As for evidence of Button's asthma, Dr. Singh reported only "[m]inimal expiratory wheezing[.]" Tr. 178.

Dr. Singh's diagnostic impression was that Button had exertional asthma which was stable but he would need to use an inhaler; he had a history of bipolar disorder which was under control as a result of the use of medications; he had a remote history of a urinary tract infection but no such current problems; he was overweight/obese but had no limitations as a result of that obesity.[21] Tr. 179.

On August 1, 2006, Frederick B. Myers, M.D., reviewed Button's medical records on behalf of the Bureau of Disability Determination and concluded that Button had the physical ability to engage in the full-range of medium work. Tr. 181-186.

---

[21]It was reported that Button weighed 415 pounds. Tr. 178.

Also, on August 1, 2006, Paul A. Perch, Ed.D., a psychologist, reviewed Button's medical records on behalf of the Bureau of Disability determination and concluded that Button suffered from mood disorder, not otherwise specified, but that it was a non-severe impairment. Tr. 187-199. Dr. Perch stated that Button had no restrictions in activities of daily living; no difficulties in maintaining social functioning; no difficulties maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of an extended duration. Tr. 197. Dr. Perch indicated that Button had not been hospitalized for psychiatric problems and that his current mental status showed no significant abnormalities. Tr. 199. He further opined that based on the evidence of record, Button's statements regarding his limitations were only partially credible. Id.

After the evaluation by Dr. Perch, the record does not reveal any contact Button had with a medical or mental health provider until March 27, 2007. Tr. 251-252. On that date, Button had an "Initial Contact Assessment" with Amber M. Cooper, MSW, a social worker located in Wellsville, New York. Tr. 251-252. At the appointment with Ms. Cooper, Button reported that he had been with his fiancé for eight years and that his relationship was "pretty good." Tr. 251. Button also told Ms. Cooper that he was fired from jobs "many times" because of his "attitude and poor attendance" and that his most recent employment was "for a temp agency in

Florida[.]" Tr. 251. During the assessment Button "denie[d] any problems with concentration and none were evident during the intake interview." Id. The results of a mental status examination were essentially normal other than Button had a blunted affect and he was unable to describe his mood. Tr. 252. Button did note that "he has vague thoughts about how people would be better if he was no longer around." Id. After conducting the clinical interview and mental status examination, Ms. Cooper's diagnostic assessment was that Button suffered from major depressive disorder, recurrent, moderate, and she gave Button a GAF score of 53, representing moderate symptomatology. Tr. 251. Ms. Cooper opined that Button "would benefit from individual therapy to learn and increase use of healthy coping skills." Tr. 252. She also stated that Button asked to resume services with Dr. Neerukonda. Id.

On April 27, 2007, Button underwent a psychiatric evaluation performed by Dr. Neerukonda. Tr. 249-250. At the evaluation Button told Dr. Neerukonda that he was depressed, and down in the dumps; he felt hopeless, helpless and worthless; and he was irritable, grouchy and gets agitated. Tr. 249. Button also reported that he was not sleeping well, he had racing thoughts, and that he was having mood swings. Id. Also in contrast to what Button told Ms. Cooper that his relationship with his fiancé was "pretty good," he told Dr. Neerukonda that his relationship with his "significant other" was "not quite up to it" and that he was

23

getting "very frustrated with her." Id. Oddly Dr. Neerukonda in the report of the April 27th evaluation incorrectly noted that he had only seen Button one time in the past when in fact as detailed earlier he had seen Button on several previous occasions. Id. Dr. Neerukonda also in the report of the evaluation noted Button's history of drug and alcohol abuse and that Button still "occasionally drinks beer." Id. In reviewing Button's social, personal and family history, Dr. Neerukonda reported Button's self-reported problems with math and stated that Button told him that he "had about over 100 jobs and the longest was six months."[22] Id. When Dr. Neerukonda asked Button why he had so many jobs, Button stated "I get frustrated and I get bored and I am not able to function." Id. A mental status examination of Button was essentially normal other than Button's mood was depressed and his affect was anxious. Tr. 250. Button's speech was coherent, logical and relevant; he had no loosening of associations or flight of ideas; there was no evidence of psychosis; he had good cognition; and he denied suicidal and homicidal ideations. Id.

Dr. Neerukonda's diagnostic impression was significantly different from what he reported in 2006. Id. Dr. Neerukonda could not rule out bipolar disorder mixed and also found that Button suffered from alcohol dependence in remission and marijuana and

---

[22]As stated earlier in this memorandum, Button testified at the administrative hearing that he had 30 to 35 jobs but all of short duration and the longest lasting 4 to 5 months. Tr. 53-55.

heroin abuse in remission. Id. Dr. Neerukonda also could not rule out a learning disability.[23] Id. Dr. Neerukonda also gave Button a GAF score of 50 to 55 which overlaps the top end of the range for serious symptomatology and a portion of the range for moderate symptomatology. Id. Dr. Neerukonda prescribed the psychotropic medications Celexa and Seroquel[24] and provided "[s]upportive psychotherapy." Id. Dr. Neerukonda noted that he was prescribing "Seroquel 25 mg at the nighttime for {Button] to sleep better[.]" Id. Follow-up appointments with Dr. Neerukonda were scheduled for June 1 and 8, 2007, but Button failed to appear at those appointments. Tr. 247-248.

On July 19, 2007, Button had an appointment with Danielle R. Kwayke-Berko, M.D., at Jones Memorial Hospital Medical Practice located in Wellsville, New York. Tr. 227-230. The purpose of the appointment was to establish care regarding Button's asthma condition and because Button was having "some intermittent left ear

---

[23]The "rule-out" diagnosis is used inconsistently by different physicians and psychologists and the context in which the "rule-out" diagnosis is made has to be closely scrutinized. The "rule-out" diagnosis can have two different meanings. It can mean that the particular condition is in fact ruled out, i.e., the patient is not suffering from the condition, but it also can mean that further information is needed to evaluate whether the patient is in fact suffering from the condition. In the present case it is clear that Dr. Neerukonda could not definitely say that Button suffered from bipolar disorder mixed or a learning disability.

[24]Seroquel "is an antipsychotic medicine" used to treat several conditions including bipolar disorder and in conjunction "with antidepressant medications to treat major depressive disorder in adults." Seroquel, Drugs.com, http://www.drugs.com/seroquel.html (Last accessed December 18, 2013).

pain for several months." Tr. 227.

Button told Dr. Kwakye-Berko that he was never hospitalized for asthma but that he had visited emergency departments and the last such visit "for an asthma exacerbation was a year ago." Id. Button also told Dr. Kwakye-Berko that he "has been without his Albuterol for some time" and "[h]e last saw a [primary care physician] three to four months ago."[25] Id.

Dr. Kwayke-Berko noted that Button had a history of depression, he was being followed and managed by Dr. Neerukonda and that Button's next appointment with Dr. Neerukonda was in two weeks. Id. Button told Dr. Kwayke-Berko that he stopped taking Seroquel because of drowsiness but that he did not tell Dr. Neerukonda. Tr. 228. Button was advised by Dr. Kwayke-Berko to call Dr. Neerukonda and inform him of the situation. Id.

In the report of this appointment, Dr. Kwayke-Berko under social history noted that Button was smoking at least one pack of cigarettes per day for 20 years and he was consuming two to three alcoholic beverages every two months. Id. When Button's systems were reviewed, Button denied suicidal and homicidal ideations and anxiety. Id.

The results of a physical examination were essentially

---

[25]Three to four months prior to this appointment would have been in March or April, 2007, and our review of the administrative record did not reveal any medical records from that time frame.

26

normal other than Button was morbidly obese,[26] there was evidence of a left middle ear infection (otitis media), he had swollen glandular tissue in the neck area (cervical chain adenopathy), and he had trace edema in the lower extremities. Id.

Dr. Kwakye-Berko's diagnostic assessment was that Button suffered from asthma, tobacco abuse and left otitis media. Tr. 229. Dr. Kwakye-Berko further noted that Button had a history of pneumonia and he was provided with a Pneumovax vaccine which he tolerated well. Id. She also stated that Button had a family history of amyotrophic lateral sclerosis (ALS), also known as Lou Gehrig's Disease, but that Button was denying symptoms of that conditions, including difficulty walking or bearing weight, dysarthria,[27] difficulty chewing (mastication) or swallowing, and shortness of breath other than associated with his asthma and

---

[26]Button was 6 feet tall and weighed 397.6 pounds. An individual of such height and weight has a body mass index of 53.9 and is considered morbidly obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc. gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bm i_calculator.html (Last accessed December 18, 2013). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www. Mayoclinic.com/health/obesity/DS00314 (Last accessed December 18, 2013). Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when the person has a BMI of 40 or more. With morbid obesity, the person is especially likely to have serious health problems. Id.

[27]Dysarthria is defined as "a speech disorder consisting of imperfect articulation due to loss of muscular control after damage to the central or peripheral nervous system." Dorland's Illustrated Medical Dictionary, 572 (32nd Ed. 2012).

cigarette usage. Id. Button was prescribed medications for his asthma, including Singulair, and an antibiotic for his ear infection. Id. Button was also prescribed the drug Chantix for his tobacco abuse. Id.

On August 1, 2007, Button had an appointment with Dr. Kwakye-Berko regarding upper respiratory symptoms of congestion and cough but Dr. Kwakye-Berko "was running behind" that day and Button left the office without having an examination performed. Tr. 225. However, Button was given prescriptions for an antibiotic (Z-pak), Carotin, Mitral-Dosepak (a steroid medication) and Robitussin. Id.

On August 3, 2007, Button had an appointment with Dr. Neerukonda. Tr. 246. In the report of this appointment Dr. Neerukonda stated that Button "carrie[d] the diagnosis of bipolar disorder mixed" and that Button "seem[ed] to be doing the same." Id. Dr. Neerukonda noted that Button continued to take Celexa but was no longer taking Seroquel "because it was making him groggy." Id. Dr. Neerukonda stated that Button told him that he was applying for disability but "on the other hand" Button stated "that he is interested in digital art where he is doing a lot of things on the computer[.]" Id. Dr. Neerukonda noted that Button's "thought process seem[ed] to be doing pretty good." Id. The results of a mental status examination were essentially normal other than Button's mood was depressed and his affect anxious. Id. Button had good cognition. Id. The report of this appointment

reveals that Dr. Neerukonda's changed his diagnostic assessment to bipolar disorder mixed.[28] Id. Dr. Neerukonda prescribed the psychotropic medication Celexa and told Button to continue taking Seroquel and provided "[s]upportive psychotherapy." Id. Button failed to appear at an appointment with Dr. Neerukonda scheduled for September 7, 2007. Tr. 245.

Button next appeared at an appointment with Dr. Neerukonda on September 21, 2007. Tr. 244. In the report of that appointment Dr. Neerukonda indicated that Button still carried the diagnosis of bipolar disorder mixed and that he was "doing very well on the Celexa and Seroquel." Id. Button told Dr. Neerukonda that since the last appointment which was on August 3rd he "ended up in jail a couple times" but did not give any details. Id. According to Dr. Neerukonda other than that incarceration Button was "coming along very well." Id. Button was sleeping and eating well and there was "[n]o evidence of any irritability or grouchiness going on." Id. Button told Dr. Neerukonda that "things [were] definitely looking better and brighter and things [were] not bothering him at all at this time." Id. Button reported that he was less anxious and less nervous. Id. The results of a mental status examination were

---

[28]There is no indication why Dr. Neerukonda changed the diagnosis from a rule out diagnosis of bipolar disorder mixed of April 27, 2007, to a definitive diagnosis of bipolar disorder mixed at this appointment. The medical records reveal no real change in Button's condition from the April 27, 2007 appointment with Dr. Neerukonda other than possibly for the better in that Button was now expressing interest in digital art and computers.

essentially normal other than Button exhibited a "mildly depressed" mood and an anxious affect. Id. Button exhibited no psychosis and his "[c]ognition [was] good." Id. Button's speech was coherent, logical and relevant; he had no loosening of associations or flight of ideas; and he denied any suicidal thoughts. Id. The diagnostic impression was bipolar disorder mixed and Dr. Neerukonda continued Button's prescriptions for Celexa and Seroquel and provided supportive psychotherapy. Id. Button was a "no show" at appointments with Dr. Neerukonda scheduled for October 5 and November 2, 2007. Tr. 242-243. It was noted on the record of the November 2nd "no show" that Button would "not receive medicine until he shows for [an appointment]." Tr. 242.

On November 14, 2007, Button had an appointment with Dr. Kwakye-Berko regarding an upper respiratory infection. Tr. 221-222. Button was diagnosed with an upper respiratory infection (sinusitis/bilateral otitis media/bronchitis), allergic rhinitis, chronic obstructive pulmonary disease exacerbation, and tobacco abuse. Tr. 222. The report of this appointment details the symptoms of these conditions and the results of a physical examination are consistent with the diagnosis.[29] Tr. 221-222. Medications were prescribed by Dr. Neerukonda, including an antibiotic. Tr. 222. It was noted that Button was still smoking and he was encouraged

---

[29]The report of this appointment also notes that Button "recently [came] out of the pen[itentiary]" and that "during the time he was in the penitentiary . . . he was taken off of all of his medications." Tr. 221.

to stop smoking. Id. Even though he was still smoking and complaining of shortness of breath, his blood oxygen saturation level was 96%.[30] Id.

Button was a "no show" at an appointment with Dr. Kwakye-Berko scheduled for November 30. 2007. Tr. 220.

Button was a "no show" at an appointment with Dr. Neerukonda scheduled for December 7, 2007. Tr. 241. It appears, however, that the "no show" was excused and rescheduled for January 11, 2008, and on that date Button did appear for an appointment with Dr. Neerukonda. Tr. 240-241. The report of the January 11th appointment reveals that Button was "doing very well on the Celexa and Seroquel." Tr. 240. Button told Dr. Neerukonda that he was "coming along very well." Id. Button was sleeping and eating well; there was "[n]o evidence of any issues whatsoever;" there was "[n]o evidence of any agitation whatsoever;" and Button stated that "things [were] definitely looking better and brighter and things [were] not bothering him like the way they were." Id. The results of mental status examination were essentially normal other than Button exhibited a depressed mood and an anxious affect. Id. Button exhibited no psychosis and his "[c]ognition [was] good." Id. Button's speech was coherent, logical and relevant; he had no loosening of associations or flight of ideas; and he denied any suicidal or homicidal thoughts. Id. The diagnostic impression was

---

[30]Normal blood oxygen saturation ranges from 95% to 100% but values down to 90% are common and not cause for alarm.

bipolar disorder, although the "mixed" designation was dropped, and Dr. Neerukonda continued Button's prescriptions for Celexa and Seroquel and provided supportive psychotherapy. Id. A 10-12 week follow-up appointment was scheduled. Id.

Button was a "no show" at an appointment with a medical provider at Jones Memorial Hospital Medical Practice (we assume Dr. Kwakye-Berko) scheduled for February 12, 2008.[31] Tr. 219.

Button next appeared at an appointment with Dr. Neerukonda on March 7, 2008. Tr. 239. In the report of that appointment Dr. Neerukonda indicated that Button still carried the diagnosis of bipolar disorder and that he was "doing pretty good at this time." Id. Button was taking his medications as prescribed and he was sleeping and eating well. Id. Button did report that the Seroquel was making him groggy and Dr. Neerukonda discontinued that medication and prescribed the antidepressant Trazodone[32] instead. Id. The results of mental status examination were essentially normal other than Button exhibited a depressed mood and an anxious affect. Id. Button exhibited no psychosis and his "[c]ognition [was] good." Id. Button's speech was coherent, logical and relevant; he had no loosening of associations or flight of ideas;

---

[31]The record is a Jones Memorial Hospital Medical Practice form on which there is handwriting by a registered nurse indicating that Button did not call and did not appear at the scheduled appointment. Tr. 219.

[32]Trazodone, Drugs.com, http://www.drugs.com/trazodone.html (Last accessed December 19, 2013).

and he denied any suicidal thoughts. Id. The diagnostic impression was bipolar disorder mixed and Dr. Neerukonda continued Button's prescriptions for Celexa, discontinued Seroquel, and added Trazodone as noted above, and provided supportive psychotherapy. Id.

On March 11, 2008, Button had an appointment with Dr. Kwakye-Berko for a physical. Tr. 216-217. When Dr. Kwakye-Berko reviewed Button's systems, Button complained of bilateral ear pain and migraine headaches but the remaining systems review was negative. Tr. 216. The results of a physical examination were essentially normal other than Button was morbidly obese and there was evidence of a middle ear infection and goiter.[33] Id. An examination of Button's extremities revealed no cyanosis, clubbing or edema. Id. Button had normal motor strength and reflexes in his upper and lower extremities. Id. Dr. Kwakye-Berko's diagnostic assessment was that Button suffered from goiter and bilateral otitis media but noted that he was asymptomatic for asthma. Tr. 217. In fact Button denied "any acute symptomatology or an exacerbations" of asthma. Id. Button was prescribed an antibiotic for the ear infection and with respect to the goiter it was noted that he had "never had any labs up until this point" and routine blood work (a complete metabolic panel, a lipid profile and thyroid stimulating hormone (TSH)) was ordered. Id.

---

[33]Goiter is a swelling of the neck from an enlargement of the thyroid gland.

Button was a "no show" at an appointment with Dr. Kwakye-Berko scheduled for April 1, 2008. Tr. 215.

Button had appointments with Dr. Neerukonda on April 4 and 11, 2008. Tr. 237-238. On both occasions Dr. Neerukonda's diagnostic assessment was bipolar disorder depressed and he continued Button's prescription for Celexa and provided supportive psychotherapy. Id. The record of the April 4th appointment reveals that Button was "coming along very well" and that he was only "getting frustrated once in awhile because he [was] not able to work." Tr. 238. The results of a mental status examination on April 4th were essentially normal other than Button exhibited a depressed mood and anxious affect. Id. The report of the April 11th appointment also reveals that Button was "doing very well[.]" Tr. 237. The results of a mental status examination on April 11th were essentially normal other than Button exhibited a depressed mood and anxious affect. Id. Button's cognition was noted to be good. Id. On both occasions, Button looked his stated age, he was casually dressed, and he was alert, awake, responsive, and oriented to person, place and time; Button's speech was coherent, logical and relevant; he exhibited no psychosis; and he had no loosening of associations or flight of ideas. Tr. 237-238.

Button was a "no show" at appointments with Dr. Neerukonda scheduled for May 9 and 16 and June 8, 2008. Tr. 234-236.

On July 8, 2008, Button had an appointment with Dr.

Kwakye-Berko regarding cold symptoms and for renewal of his Chantix and Singulair prescriptions. Tr. 212-214. In the report of this appointment Dr. Kwakye-Berko noted that Button had been a "no show" at several appointments and that he was "told if he has another no show then he will need to be discharged from [the Jones Memorial Hospital Medical Practice's] service." Tr. 212. The report of this appointment also notes that Button complained of some right shoulder discomfort caused by heavy lifting and that the results of a recent x-ray were unremarkable. Id. Dr. Kwakye-Berko further observed that she thought that it was "funny" that Button stated that he had been given pain medication but her review of the records revealed that she did not prescribe any such medication. Button was asked what pain medication he was taking and he informed Dr. Kwakye-Berko that he was taking Tramadol (Ultram), which is a narcotic-like pain reliever used to treat moderate to severe pain.[34] Tr. 212. The results of a physical examination were essentially normal other than evidence of an upper respiratory infection and a middle ear infection, morbid obesity, an elevated temperature, and a rapid pulse. Tr. 212-213. The diagnostic assessment was that Button suffered from sinusitis, bronchitis, and bilateral otitis media; a right shoulder sprain; allergic rhinitis; asthma and/or history of thereof; and transient high blood

---

[34]Tramadol, Drugs.com, http://www.drugs.com/tramadol.html (Last accessed December 18, 2013). Our review of the administrative record did not reveal any medical record indicating that Button was prescribed Tramadol.

pressure.[35] Tr. 213. Button was prescribed the antibiotic Augmentin for the respiratory and bilateral ear infections; Chantix for smoking cessation; Tylenol Extra Strength for the shoulder sprain; Singulair for the allergic rhinitis; and Combivent MDI and Advair for the asthma. Id. Dr. Kwakye-Berko noted that Button's asthma was stable. Id.

Button was a "no show" at an appointment with Dr. Kwakye-Berko scheduled for August 12, 2008. Tr. 211.

The last record that we encounter is a "check-box" form entitled "Medical Source Statement Regarding the Nature and Severity of an Individual's Mental Impairment" with some barely legible handwriting inserted on it which was completed on November 7, 2008, by Dr. Neerukonda on behalf of Button. Tr. 253-256. Prior to completing this form the last time Dr. Neerukonda examined Button was April 11, 2008, when he found that Button was "doing very well[.]"[36] Tr. 237. The form required Dr. Neerukonda to rate

_____

[35]Normal blood pressure is below 120/80; prehypertension is 120-139/80-89; stage 1 hypertension is 140-159/90-99; and stage 2 hypertension is 160/100 or more. When the top number(systolic) is in the abnormal range and the bottom number (diastolic) is normal, the top number (systolic) is used to classify the patient's condition. See High blood pressure (hypertension), Mayo Clinic Staff, http://www.mayoclinic.com/health/blood-pressure/ HI00043/ (Last accessed December 18, 2013). Button's blood pressure when initially taken was abnormal because it was 116/90. When taken a second time his blood pressure was 116/88. Tr. 213. The lower number was elevated and abnormal.

[36]The record does contain a list of prescription refills and that list indicates that either Dr. Neerukonda or someone working for or with him called in a renewal of Celexa and Trazodone to a Walgreen Pharmacy. The date of the call is handwritten and could

several areas of mental work-related functioning. Tr. 253-252. Dr. Neerukonda found that Button was moderately limited in his ability to (1) understand and remember short, simple instructions, (2) carry out short, simple instructions, (3) understand and remember detailed instructions, (4) carry out detailed instructions, (5) make judgments on simple work-related decisions, and (6) interact appropriately with co-workers, and markedly limited in his ability to (1) interact appropriately with the public and supervisors and (2) respond appropriately to work pressures in a usual work setting. Tr. 253-254. The form defined "moderate" as "[t]here is moderate limitation in this area but the individual is still able to function satisfactorily" and "marked" as "[t]here is serious limitation in this area [and] [t]he ability to function is severely limited but not precluded." Tr. 253. Dr. Neerukonda stated that with respect to responding appropriately to work pressures in a usual work setting Button would be off task 15-30 minutes per hour and with respect to responding appropriately to changes in a routine work setting Button would be off task 10-15 minutes per hour. Tr. 254. Dr. Neerukonda noted several factors that would increase Button's level of impairment, including production demands and quotas. Id. Dr. Neerukonda on the form did not state when these impairments arose or that they had lasted a continuous period

---

possibly be either April 15 or September 15, 2008. Tr. 233.
However, there is no evidence in the record that Dr. Neerukonda
actually examined Button on either of those dates.

of 12 months or more or were expected to last a continuous period of 12 months or more. Tr. 253-256.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Button had not engaged in substantial gainful work activity since March 29, 2006, the date Button filed his application for supplemental security income benefits. Tr. 20.

At step two of the sequential evaluation process, the administrative law judge found that Button had the following severe impairments: "a bipolar disorder, asthma, back impairments, and a learning disability." Id.  In finding that Button's asthma, back condition and learning problems were severe impairments the administrative law judge gave Button the benefit of the doubt. Tr. 20-21.  In finding those condition severe, the ALJ stated in pertinent part as follows:

> The claimant has complained of low back pain.  There are no radiographic studies showing any significant abnormalities such as disk herniation, spinal stenosis or nerve root impingement.  There are no EMG or nerve conduction studies and the claimant has not complained of any sensory or motor abnormalities.  A consultative physical examination of the claimant revealed no abnormalities. . . In the absence of any supporting medical evidence the claimant's back impairment would not be considered a medically determinable severe impairment, but interpreting the facts in the light most favorable to the claimant, I will accept that the claimant may have a minor back impairment which contributes to some level of lifting and carrying limitations and therefore constitutes a portion of the claimant's combination of severe impairments. . . . Although, like his back impairment, there is very little evidence to support the claimant's asthma as a severe

38

impairment in and of itself, I will accept that in
combination with his other impairments they constitute
a severe combination of impairments. . . The claimant
also has a reported history of learning problems. These
were not severe enough to interfere with the claimant's
ability to obtain a high school equivalency diploma (GED),
but I will accept that the evidence indicates that the
claimant does have some level of learning limitation.

Tr. 20-21. Our detailed review of the medical records reveals that the administrative law judge was correct in noting that there was a lack of medical evidence relating to Button's alleged back impairment and he was extremely generous in finding that Button's alleged back impairment, asthma and learning disorder were in combination a severe impairment.

At step three of the sequential evaluation process the administrative law judge found that Button's impairments did not individually or in combination meet or equal a listed impairment. Tr. 21-22. Button has not challenged the administrative law judge's step three analysis.

At step four of the sequential evaluation process the administrative law judge found that Button could not perform his past relevant work as a taxicab driver and janitor but that he could perform a limited range of unskilled, medium work which allowed him to avoid hazards, exposure to respiratory irritants such as fumes, dust and airborne particles and would be limited to simple, routine and repetitive tasks involving use of independent judgment or discretion and changes in the workplace no more than 1/6 of the time, and there would be no interaction with the general

public. Tr. 22.  In setting Button's residual functional capacity, the administrative law judge relied on the opinions of the state agency consultants and the forms completed by them but also as noted above gave Button the benefit of the doubt. Id.

In setting the residual functional capacity, the administrative law judge reviewed the medical records and considered several other items including the opinions of the state agency consultants and the opinion of Dr. Neerukonda. Tr. 22-25. Also, in arriving at this residual functional capacity the administrative law judge found that Button's statements about his functional limitations were not credible to the extent they were inconsistent with the above residual function capacity. Tr. 23.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Button had the ability to perform work such as a packing machine operator and a hand packer,[37] and that there were a significant number of such jobs in the regional and national economies. Tr. 26.

---

[37]The vocational expert testified that the packaging machine operator position as listed in the Dictionary of Occupational Titles was unskilled, medium work but there were a lot of such positions at the light exertional level. Tr. 58.  He also noted that because such positions were single operator machines, the person would be working alone. As for the hand packer position, the vocational expert testified that it was unskilled, medium work. Tr. 58-59.

The administrative record in this case is 256 pages in length, primarily consisting of medical and vocational records. The administrative law judge did an adequate job of reviewing Button's medical history and vocational background in his decision. Tr. 18-26. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 11, Brief of Defendant.

Button makes a broad and general argument that the administrative law judge failed to properly consider the medical evidence of record but essentially focuses on the alleged failure of the administrative law judge to consider administrative hearing Exhibit 10F which was Dr. Neerukonda's assessment of Button's work-related mental functional abilities which he completed on November 7, 2008. We have thoroughly reviewed the record in this case and find that the alleged failure of the administrative law judge to consider Exhibit 10F is not a basis to find that his decision is not supported by substantial evidence.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c).

No treating or examining physician has indicated that Button suffers from physical or mental functional limitations that would preclude him from engaging in the limited range of  work set by the administrative law judge in his decision for the requisite statutory 12 month period.[38]  No physician indicated that Button was incapable of engaging in the limited range of work set by the administrative law judge on a full-time basis.

Although giving Button the benefit of the doubt, the administrative law judge relied on the opinions of Dr. Singh and Dr. Myers, the state agency physicians, and Dr. Perch, the state agency psychologist. The administrative law judge's reliance on those opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").  The record does not contain any statement from a treating physician that Button had physical limitations that would preclude him from engaging in work as a packing machine operator or as a hand packager and the bare medical records do not provide support for such a conclusion. Furthermore, as noted above Dr. Neerukonda did not indicate that Button from a

_____

[38]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

mental standpoint was disabled for the requisite 12-month period. Furthermore, Dr. Neerukonda treatment records do not support his marked limitations which he set forth in Exhibit 10F and also as noted that assessment was completed several months after he last saw Button.

The administrative law judge rejected the marked limitations set forth in Dr. Neerukonda's assessment. The Court of Appeals for this circuit has set forth the standard for evaluating the opinion of a treating physician in <u>Morales v. Apfel</u>, 225 F.3d 310 (3d Cir. 2000). The Court of Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

<u>Id.</u> at 317-18 (internal citations omitted). The administrative law judge is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(d). In the present case, the administrative law judge in his decision specifically addressed the opinions of Dr. Neerukonda as well as the credibility of Button. Tr. 23-24.

43

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence. An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements. 20 C.F.R. § 404.1508 (2007). The administrative law judge appropriately considered the contrary medical opinion of the state agency physicians and psychologist and the objective medical evidence and concluded that the disability opinion of Dr. Neerukonda was not adequately supported by the objective medical evidence.

As for the claim that the ALJ ignored or overlooked Exhibit 10F, the ALJ referenced that exhibit number in his decision when performing his analysis at step three of the sequential evaluation process. Tr. 22. The ALJ in setting the residual functional capacity at step 4 stated that he had "given significant consideration to the various statements made by the claimant's treating psychiatrist, Dr. Neerukonda." Tr. 24. Also, the ALJ was well-aware of Exhibit 10F because at the administrative hearing

counsel for Button used information from that Exhibit in questioning the vocational expert and counsel also referred to it in his closing argument after which the ALJ indicated he would take those arguments (which relied on Exhibit 10F) into consideration when rendering a decision. Tr. 66.

Finally, as noted earlier the Appeals Council specifically addressed Button's contention relating to Exhibit 10F when denying his request for review and noted that Dr. Neerukonda's treatment records did not support the conclusion that Button lacked the capacity to perform the specific jobs identified by the vocational expert.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


Dated: December 20, 2013